UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NACHE AFRIKA,

                Petitioner,

    -vs-

THE STATE OF NEW YORK

                Respondent.

_____

**DECISION AND ORDER**
**No. 12-CV-0537MAT**

## I.    Introduction

*Pro se* petitioner Nache Afrika ("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered May 2, 2008, in New York State, Erie County Court, convicting him, after a jury trial, of Robbery in the First Degree (N.Y. Penal Law ("Penal Law") § 160.15 [4]), Rape in the First Degree (Penal Law § 130.35 [1]), and Sodomy in the First Degree (Penal Law § 130.50 [1]).[1]

For the reasons stated below, habeas relief is denied and the petition is dismissed.

---

[1]    The instant May 2, 2008 judgment is the result of a retrial. Previously, in 2004, the Appellate Division, Fourth Department reversed a judgment convicting Petitioner of the same offenses and granted him a new trial. People v. Afrika, 9 A.D.3d 876 (4th Dep't 2004), *amended on reargument*, 11 A.D.3d 1046 (4th Dep't 2004).

## II.  Factual Background and Procedural History

### A.   The Trial

### 1.   The People's Case

On the evening of October 27, 1998, Jacqueline Kaminska ("Kaminska") and Kristin Borland ("Borland") were working at Marshall's Department Store in Cheektowaga, New York. Trial Trans. [T.T.] 628, 632, 689-690. Just after 9:30 p.m., after it appeared that the last customers had left the store, Kaminska approached Borland and asked her to accompany her to the back of the store to help her lock up. Tr. 634-635. Kaminska locked the back door and the two women then turned to go back to the front of the store. As they did, they saw a tall man wearing a ski mask and carrying a silver gun. Tr. 635-636, 692. The man wore a military-style jacket and boots. Tr. 636. The women could tell the man was African-American from the exposed skin visible around the openings in the ski mask. Tr. 636-637, 692-693. The women screamed and the man told them to "shut the fuck up." Tr. 693. He pointed the gun at the women and told them that it was loaded and that he was not afraid to use it. Tr. 637-638, 692-694. He also told the women to stop looking at him and to look down. Tr. 638, 694. Borland, fearing that the man would in fact shoot her, did not look at him. Tr. 694. He stated that he was looking for money, and Kaminska told him that she would give him anything he wanted. Tr. 640. He then took the women by the back of their necks and marched them to

the front of the store.  Tr. 641-642, 694.  Concerned that they would be visible on the store cameras and to other employees waiting outside the store, the man made the women crouch low and stay on the perimeter of the building.  Tr. 641-642, 644, 694-695.

When they reached the front of the store, the man demanded that Kaminska open the safe, which she was unable to do due to the sensitivity of the safe's dial and because she wore bifocals.  Tr. 645.  The man became "very upset" with Kaminska and she asked Borland to open it instead.  Tr. 645.  Borland opened the safe and the man produced a pink duffle bag.  He instructed her to fill the duffle bag with the contents of the safe, which she did.  Tr. 646-647, 696.  The man rifled through each woman's handbag, took whatever money was inside, and also looked through their personal information and photographs.  Tr. 647.  The man then tied Kaminska to a chair with tape in the cash office, and, at some point before leaving, ripped the phone card out of the wall.  He told her that he was taking Borland to the back of the store to show him the way out.  Tr. 649, 650, 696-697, 698.  Kaminska, fearing that the man would hurt Borland, told him that he knew the way out and did not need Borland to show him.  Tr. 650-651, 697.  Kaminska begged him not to hurt Borland, indicating that she was "a young girl."  Tr. 697.  The man indicated that he would not do anything to Borland, and then leaned down and whispered to Kaminska that she should "consider this [her] lucky day."  Tr. 651.

Borland believed that the man was going to shoot Kaminska in the back of the head "in case she had seen something." Tr. 698. Instead, the man walked Borland, who was carrying the duffle bag full of money, to the back of the store. Tr. 698. As they approached the door to the outside at the back of the store, the man told her to stop and turn around. He then attempted to tie her wrists, which he was unable to do. Instead, he held the gun in front of Borland and stated, "you remember I have this." Tr. 699. The man lifted up Borland's skirt and she began to cry. He told her to stop crying and that he was "only going to touch." Tr. 700. He then rolled her pantyhose down, and Borland heard him unzip his pants. Tr. 700. He instructed Borland to lay forward onto some rollers, and then told her to turn her and get on her knees. He told Borland to perform oral sex on him, instructing her to "give it to him fast, give it to him like [she] [did] [her] boyfriend." Tr. 701. Borland put his penis in her mouth, keeping her eyes closed the entire time. Tr. 701. He then directed Borland to lay down and he inserted his penis into her vagina. Tr. 702. At some point, he got off Borland and, while standing, masturbated and ejaculated on Borland. Tr. 702. The man wiped his ejaculate away with "something plastic" that was on the floor. Tr. 702-703. Borland testified that she kept her eyes shut while the man raped her because she was afraid he would shoot her. Tr. 702-703. When she thought the man had left, Borland got up from the floor,

straightened her clothes, and went to the front of the store where she tearfully told Kaminska that she was raped.  Tr. 652, 703-704.  Kaminska eventually called 911.  Tr. 653, 705.

Borland was taken to Erie County Medical Center where a rape examination was conducted.  Tr. 705-706.  After the examination, Borland was taken to the police station to make a statement.  Tr. 707.

At trial, Petitioner's redacted grand jury testimony was read to the jury.  Tr. 805-821.  Petitioner testified that he lived in Rochester and did not come to Buffalo frequently.   Tr. 816.  According to him, the last time he was in Buffalo was for the Juneteenth Festival at Martin Luther King Park in June 1998.  Tr. 816.  He testified he had three young children, as well as an older daughter from a prior relationship.  Tr. 817.  According to him, he was at home in Rochester putting his three young children to bed on the night of the crime.  He testified further that he did not own a handgun, did not know where Marshall's Department Store in Cheektowaga, New York was, and had never shopped in Marshall's in Rochester or Buffalo.  Tr. 814-815, 820.

Angelia Smith-Wilson ("Smith-Wilson") testified that she married Petitioner in 1996, had a daughter with him in 1997, and separated from him shortly thereafter.  Tr. 824-825.  She testified that she recalled seeing clothing items with Marshall's tags in Petitioner's apartment in November 1998.  Tr. 828.

Monique Conner ("Conner") testified that she met Petitioner in February 1997 in Rochester and dated him until November 1998. Tr. 859-861.  She testified that while she was dating Petitioner, he traveled to Buffalo three or four times a month and that sometimes she would go with him.  Tr. 861.  She testified that, when they traveled to Buffalo, they went to the Galleria Mall, the Juneteenth Festival, and also visited a jail.  Tr. 862.  Further, Conner testified that she saw a silver handgun in Petitioner's apartment on several occasions, and that she also saw it in his truck.  Tr. 863.

Paul Hojnacki ("Hojnacki"), a forensic serologist for the Erie County Central Police Services Forensic Scientific laboratory, testified that he performed a DNA analysis on sperm cells that were found on Borland's pantyhose.  Tr. 901-907.  When Hojnacki compared the DNA profile found on Borland's pantyhose with that of an early suspect (David Costner) and with that of Borland's boyfriend (Matt Burke), both were excluded as contributors.  Tr. 908-910.  Hojnacki testified further that he developed the major profile of the sperm fraction found on Borland's pantyhose and then entered that profile into the New York State DNA Databank.  Tr. 911.  Thereafter, he was notified that there had been a DNA match between the major profile of the sperm fraction that he had entered into the Databank and the known DNA of Petitioner which was in the Databank.  Tr. 912. Subsequently, a new independent DNA sample in the form of a buccal

swab from Petitioner was submitted to Hojnacki for DNA analysis.
Tr. 912.   Hojnacki testified that from the time he initially
performed DNA testing on the sperm fraction recovered from the
pantyhose up to the time he conducted DNA analysis of Petitioner's
known buccal swab, there had been a change regarding the type of
kit that was used in his lab.  Tr. 914.   The new kit, known as
"Identifiler" incorporated all of the loci that were found present
in the previous kit, and also used two additional loci.  Tr. 914.
The known buccal swab from Petitioner was tested using the
"Identifiler" kit, which used fifteen loci instead of thirteen.
Tr. 914. After conducting his testing, Hojnacki concluded that the
source of the major profile of the sperm fraction from Borland's
pantyhose matched the DNA buccal specimen taken from Petitioner.
Tr. 933.  He testified that the probability of finding a match in
the overall population was 1 in 305 trillion.  Tr. 933-934.  When
the African-American population probabilities were applied alone,
the probability of a match was 1 in 3.88 quadrillion.  Tr. 935-936.

## 2.   The Defense's Case

Petitioner called Dr. Michael Garrick, a professor of
biochemistry at SUNY at Buffalo, to testify for the defense.  Tr.
988-989.   Dr. Garrick testified that he had been called as an
expert witness in approximately 40 cases, "about half and half
between prosecution and defense, and the last several years
exclusively for the defense." Tr. 990.   Dr. Garrick testified

that he was familiar with "Identifiler" and that it had been in use for several years.  He explained that "there have been, over time, a number of changes in the technology, and ['Identifiler'] is essentially the most recent."  Tr. 992.  Dr. Garrick testified that if Petitioner had been excluded at one of two untested loci using the "Identifiler" technology, he would have been completely excluded.  Tr. 993.

On cross-examination, Dr. Garrick testified that he was not claiming Petitioner had been excluded, he was not a forensic serologist, and was a population geneticist according to training but did not have a degree in same.  Tr. 994-995.  When asked by the prosecutor what the chances are that Petitioner would have been excluded had those additional two sites been evaluated, he responded "the chances are fairly small."  Tr. 999.

### 3.  Verdict and Sentence

At the close of the trial, Petitioner was found guilty as charged and sentenced, as a second violent felony offender, to twenty-five years imprisonment for each offense.  The sentences were set to run consecutively.  Sentencing Mins. [S.M.] 10.

### B.  Petitioner's Direct Appeal

Petitioner appealed his judgment of conviction, which was unanimously affirmed by the Appellate Division, Fourth Department on December 30, 2010.  People v. Afrika, 79 A.D.3d 1678 (4th Dep't 2010); lv. denied, 17 N.Y.3d 791 (2011).

## C.    The Habeas Corpus Petition

This habeas corpus petition followed, wherein Petitioner seeks relief on the following grounds: (1) that the trial court erred in failing to suppress the DNA evidence obtained from a buccal swab; (2) the evidence presented to the grand jury was insufficient to support the indictment; (3) the evidence presented at trial was legally insufficient to support his convictions; and (4) that the prosecutor's use of three peremptory challenges during jury selection violated the precepts of Batson v. Kentucky, 476 U.S. 79 (1985).[2]

Respondent filed an Answer and Opposing Memorandum of Law (Dkt. Nos. 7, 8), and Petitioner filed a Reply thereto on July 18, 2013 (Dkt. No. 18).

## III. The Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."   28

---

[2]

In his habeas petition, Petitioner also raised the following claims:  that he was denied his right to a speedy trial;  that the trial court lacked jurisdiction to try him on the original indictment because it was wrongly reinstated after having been dismissed;  the trial court erroneously imposed consecutive instead of concurrent sentences for his convictions; and that the trial court's decision to appoint Petitioner stand-by counsel –– who later became employed by the Erie County District Attorney's Office –– created a conflict of interest.  See Pet. at p 7-8.  However, in his Reply (Dkt. No. 18), Petitioner states that he "withdraws Points One, Two, Seven and Eight."  Reply at ¶ 16. Accordingly, the Court does not consider these claims and proceeds to an analysis of Petitioner's remaining claims, as they are identified and enumerated above.

U.S.C. § 2254(b)(1)(A);  see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999);  accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995). Petitioner's habeas claims are exhausted and properly before this Court.

Here, Respondent does not expressly raise exhaustion as an affirmative defense to the petition.  However, before a federal court may hear a habeas corpus petition, a petitioner must exhaust all available state remedies. 28 U.S.C. § 2254(b)(1)(A).  This requirement is not waived by the State's failure to raise it. 28 U.S.C. § 2254(b)(3).  In this case, Petitioner raised all of his habeas claims in federal constitutional terms in the state courts. See Resp't Exs. B, C.

Accordingly, the Court finds that Petitioner's claims are exhausted for purposes of federal habeas review.

## IV.  The AEDPA Standard of Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). In this case, all of Petitioner's claims were adjudicated on the merits in the state courts, and the AEDPA standard of review therefore applies.

## V.   Analysis of the Petition

### 1.   Trial Court Erred in Granting People's Application to Obtain Buccal Swab

Petitioner asserts that the trial court erred in granting the People's application to obtain a DNA sample from him in the form of a buccal swab and subsequently erred in failing to suppress the results obtained therefrom. Petitioner appears to be arguing this claim, as he did on direct appeal, as a violation of his Fourth Amendment rights and his Confrontation rights under Crawford v. Washington, 541 U.S. 36 (2004). See Pet. at 7; Reply at 8-13; see also Resp't Ex. B at 27-32. The Court finds no merit to this claim.

To the extent Petitioner raises this claim as a violation of his Fourth Amendment right to be free from unreasonable searches and seizures, said claim is barred by the doctrine set forth in Stone v. Powell, 428 U.S. 465 (1976). It is well-settled that "[w]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 494. The Second Circuit has further explained

-11-

that, under <u>Powell</u>, "review of fourth amendment claims in habeas petitions would be undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." <u>Capellan v. Riley</u>, 975 F.2d 67, 70 (2d Cir. 1992) (citing <u>Gates v. Henderson</u>, 568 F.2d 830, 839 (2d Cir. 1977) (en banc)).  Courts have viewed such a breakdown to occur when the state court "failed to conduct a reasoned method of inquiry into the relevant questions of fact and law." <u>Capellan</u>, 975 F.2d at 71 (citations and quotations omitted).  Further, a "mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." <u>Id.</u> at 72; <u>see</u> <u>also</u> <u>Gates</u>, 568 F.2d at 840 ("<u>Stone v. Powell</u> . . . holds that we have no authority to review the state record and grant the writ simply because we disagree with the result reached by the state courts.").

With respect to the existence of corrective procedures, it is clear that New York has adequate corrective procedures, which are set forth in New York Criminal Procedure Law § 710.10, et seq., for litigating Fourth Amendment claims.  <u>See, e.g.</u>, <u>Capellan</u>, 975 F.2d at 70 n.1 ("[T]he 'federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being

facially adequate.'" (quoting <u>Holmes v. Scully</u>, 706 F. Supp. 195, 201 (E.D.N.Y. 1989))).

Moreover, in the instant case, there is no evidence of an unconscionable breakdown in the underlying process despite Petitioner's contention "that the entire probable cause proceeding was fraught with error and ignored not only [s]tate law and procedure, but never afford[ed] [P]etitioner a full and fair opportunity to have [the] ground developed and/or heard." Reply at 9.   A review of the record reflects that, prior to trial, the People filed a cross demand requesting that the trial court order that a DNA sample in the form of a buccal swab be taken from Petitioner.   <u>See</u> Motion Mins. [M.M.] of 05/24/06 and 06/27/06. Petitioner opposed the People's cross demand on the grounds that the People failed to establish probable cause and it violated his confrontation rights.   <u>Id.</u>  From the bench, the trial court granted the People's application for the buccal swab, finding that the "[t]he record before this court establishes the requisite probable cause to grant the People's request."   M.M. of 06/27/06 at 11. Subsequently, Petitioner moved to suppress the results of the DNA buccal swab, and was afforded the opportunity to make a full, lengthy oral argument on the issue.   From the bench, the trial court denied Petitioner's motion to suppress.   Proceeding Mins. of 10/03/06 at 7-8, 17-31, 38-45.  Petitioner then raised the claim on appeal to the Appellate Division, Fourth Department and the court

reviewed the claim on the merits and affirmed the lower court's ruling.  See Afrika, 79 A.D.3d at 1679-1680.  Thus, the record reveals no "'disruption or obstruction of a state proceeding' typifying an unconscionable breakdown," Capellan, 975 F.2d at 70 (quoting Shaw v. Scully, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)) nor has Petitioner pointed to any.  The record clearly establishes that the state courts conducted a reasoned and thorough method of inquiry into the relevant facts and law of Petitioner's claim.  In short, his claim amounts to nothing more than dissatisfaction with the outcome of the aforementioned proceedings in the state courts.

Petitioner has therefore failed to demonstrate that his case falls within the limited circumstances allowing habeas review of Fourth Amendment claims, and is therefore denied.

To the extent Petitioner raises this claim as a violation of his Confrontation rights under Crawford, that claim is also meritless.  As the Court understands Petitioner's pleadings, he contends that his inability to confront a Dr. Pasquini –– who apparently authored a letter containing information related to the DNA databank hit that was attached to the People's application for the buccal swab –– during pre-trial proceedings violated the precepts of Crawford.  The Court finds this argument unavailing.

In Crawford, the Supreme Court held that out-of-court statements by witnesses that are testimonial are barred by the Confrontation Clause, unless witnesses are unavailable and the

defendant had a prior opportunity to cross-examine them, regardless of whether such statements are deemed reliable by the court. Crawford, 541 U.S. 36 at 68-69. Circuit Courts of Appeals have read Crawford as addressing "[b]y its own terms" testimonial hearsay *at trial* (United States v Luciano, 414 F.3d 174, 179 (1st Cir 2005) (collecting cases); see also United States v Martinez, 413 F.3d 239, 243 n.5 (2d Cir 2005), cert denied 546 U.S. 1117 (2006) (collecting cases)); see also Pennsylvania v. Ritchie, 480 U.S. 39, 52 (1987) ("The opinions of [the Supreme] Court show that the right to confrontation is a trial right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination."). Petitioner has not cited to any authority, nor is the Court aware of any, in which Crawford has been applied to pre-trial determinations, as is the case here. Accordingly, Petitioner cannot demonstrate that the Appellate Division's adjudication of this claim contravened or unreasonably applied clearly established Supreme Court law. Nor can it be said that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Accordingly, Petitioner's claim is meritless and is denied in its entirety.

**2.    The Sufficiency of the Evidence Before the Grand Jury**

Petitioner argues that the evidence before the grand jury was legally insufficient to support the indictment.  See Pet. at 7; Reply at 13.  This claim provides no basis for habeas relief.

Claims of error in New York grand jury proceedings, including allegedly insufficient evidence to indict, are not cognizable in habeas corpus proceedings where, as here, the petitioner has been convicted by a petit jury.  See Lopez v. Riley, 865 F.2d 30 (2d Cir.1989) (holding that habeas corpus petitioner's claim of insufficiency of grand jury evidence may not be raised where a petit jury heard all relevant evidence and convicted).  "'[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt.  Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.'"  Lopez, 865 F.2d at 32 (quoting United States v. Mechanik, 475 U.S. 66, 70 (1986) (footnote omitted, and alteration in, Lopez).

Since Petitioner was convicted by a jury holding the prosecution to the reasonable doubt standard of proof (see discussion *infra* at "V, 3"), his claim of insufficiency of evidence for the grand jury to indict him is not cognizable in a habeas

corpus proceeding.   See Lopez, 865 F.2d at 32.   The claim is therefore denied in its entirety.

### 3.    Challenges to Trial Evidence

Petitioner claims that the evidence was legally insufficient at trial to support his conviction.   In support of this claim, he points to the perceived weaknesses of the DNA evidence and also attacks the credibility of certain prosecution witnesses.   See Pet. at 7;   Reply at 14-24.   This claim lacks merit.

Under the clearly established law set forth in Jackson v. Virginia, a habeas court is required to consider the trial evidence in the light most favorable to the prosecution and must uphold the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   443 U.S. 307, 318-19 (1979).   Jackson "unambiguously instructs that a reviewing court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Cavazos v. Smith,     U.S.    , 132 S. Ct. 2, 6, 181 L. Ed. 2d 311 (2011) (quotation omitted).   A habeas petitioner "making . . . a [legal sufficiency] challenge bears a very heavy burden," Quirama v. Michele, 983 F.2d 12, 14 (2d Cir. 1993), and Petitioner has not satisfied it here.

In this case, there was overwhelming evidence of Petitioner's guilt, including the DNA evidence linking him to the crime, the detailed and compelling testimony from the victims with respect to the events of October 27, 1998, as well as the testimony from Petitioner's ex-wife and ex-girlfriend.  Viewing the evidence in the light most favorable to the prosecution, as this Court is required to do, a rational jury easily could have found Petitioner guilty of first-degree robbery, first-degree rape, and first-degree sodomy beyond a reasonable doubt.

Nonetheless, in a misguided effort to challenge the sufficiency of the evidence underlying his convictions, Petitioner attacks the adequacy of the DNA testing/analysis performed by Hojnacki.  Petitioner attacks the scientific methodology employed by Hojnacki, and, in particular, the number of genetic loci that were tested.  See Pet. at 7.  In his Reply papers, Petitioner also attacks the credibility of various prosecution witnesses, including Hojnacki, the victims, his ex-wife, and his ex-girlfriend.  See Reply at 14-24.  None of these arguments alter the Court's conclusion that the trial evidence was legally sufficient to support Petitioner's convictions of first-degree rape, first-degree criminal sexual act, and second-degree felony assault beyond a reasonable doubt.  Petitioner's arguments amount to nothing more than belated requests for this Court to reassess witness credibility and to reweigh the trial evidence, namely the DNA

evidence. The Court declines to do so, as it is must. Herrera v. Collins, 506 U.S. 390, 401 (1993) ("[I]t is well settled that upon habeas corpus the court will not weigh the evidence[.]" (citation and internal quotation marks omitted)); see also Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues.").

In sum, the Court finds that the state court's adjudication of Petitioner's claim did not contravene or unreasonably apply clearly established Supreme Court law, nor can it be said that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Accordingly, Petitioner's claim that the evidence was legally insufficient to support his convictions is denied in its entirety.

## 4.   **Batson** Violations

Petitioner asserts that the prosecutor violated the precepts of Batson v. Kentucky, 476 U.S. 79 (1985) in his exercise of peremptory challenges to prospective jurors Collier, Moody and Bundy. See Pet. at 7; Reply at 30-37. The Court finds this claim meritless.

The Equal Protection Clause forbids a prosecutor from challenging jurors on account of their race. Batson, 476 U.S. at

89.   Under Batson, once a defendant opposing a peremptory strike establishes a prima facie case that the prosecutor impermissibly challenged a prospective juror for a racially discriminatory purpose, the burden shifts to the prosecutor to articulate a race-neutral reason for the peremptory challenge.   Hernandez v. New York, 500 U.S. 352, 358-59 (1991); Batson, 476 U.S. at 97.  It does not matter whether the prosecutor presents worthy reasons; the Federal Constitution requires only that the prosecutor not strike a juror because of the juror's race.   Purkett v. Elem, 514 U.S. 765, 768 (1995).  If the prosecutor comes forward with a race-neutral explanation, then the burden shifts back to the defendant to prove that explanation was merely a pretext for purposeful discrimination.  Id. at 768.

"[W]hen reviewing a Batson challenge in the context of a habeas petition, a trial court's conclusion that a peremptory challenge was not exercised in a discriminatory manner is entitled to a presumption of correctness, except, inter alia, to the extent that the trial court did not resolve the factual issues involved in the challenge or if the finding is not fairly supported by the record."   Galarza v. Keane, 252 F.3d 630, 635 (2d Cir. 2001).

In this case, Batson's step one is not at issue, since the Supreme Court has held that the prima facie case of discriminatory intent becomes irrelevant to the analysis of a peremptory challenge once the trial court proceeds to the second and third steps as it

did here.  See Hernandez, 500 U.S. at 359 ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."); accord Jordan v. LeFevre, 206 F.3d 196, 200 (2d Cir. 2000) (stating that a trial judge may rule on a Batson application even in the absence of a prima facie showing of discrimination"); Sorto v. Herbert, 364 F. Supp.2d 240, 252 (E.D.N.Y. 2004), aff'd, 497 F.3d 163 (2d Cir. 2007).

As required under Batson's step two, the trial court sought race-neutral reasons for the prosecutor's peremptory challenge to the three jurors in question.  Here, the reasons proffered by the prosecutor were facially neutral.  With respect to Juror Collier, the prosecutor's proffered reasons for exercising a peremptory challenge were that Collier was unemployed, that she had a son that had been arrested and convicted of a crime, and that her son had been represented by Petitioner's stand-by counsel.  Jury Selection [J.S.] at 226-227.  With respect to Juror Moody, the prosecutor's proffered reasons for exercising a peremptory challenge were that Moody was unemployed, that she appeared to want more evidence to convict than was legally required, that she misapprehended the legal meaning of reasonable doubt, that she appeared to be sleeping at times during the voir dire process, and that she had various

medical conditions that would make it difficult for her to view photographs.  J.S. at 352-354.  And, with respect to Juror Bundy, the prosecutor's proffered reasons for exercising the peremptory challenge were that Bundy had indicated that he might need certainty to convict, that he had an "uncertain" work history, and that he exhibited difficulties in his ability to communicate with the court insofar as he had provided confusing and contradictory answers to the court's questions during voir dire.  J.S. at 519-524.  Thus, the prosecutor met the low burden called for at Batson's stage two.

Step three requires the trial court to resolve factual disputes; whether the prosecutor intended to discriminate is a question of fact.  Hernandez, 500 U.S. 352 at 364-65.  If the trial court, after considering all of the circumstances, including the prosecutor's demeanor and credibility, concludes that a proffered reason is pretextual, defendant has carried his or her ultimate burden of proving intentional discrimination.  Id. at 363-64. Batson's "final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'"  Rice, 546 U.S. at 338 (quoting Purkett, 514 U.S. at 768); see also Miller-El v. Cockrell, 537 U.S. 322 (2003).  Here, the reasons proffered by the district attorney were based upon the jurors' affirmative

statements on the record, and they were entirely reasonable and not implausible.

With respect to Collier, she had a son who had been arrested and convicted of a crime. Additionally, Collier's son had been represented by Petitioner's stand-by counsel, who Collier believed had done "an excellent job" in representing her son. Courts in this Circuit have accepted, as a satisfactory race-neutral reason, a prosecutor's explanation that prospective jurors had relatives who had been convicted of crimes. See, e.g., Green v. Travis, 414 F.3d at 300-01 (2d Cir. 2005) (finding that the "race-neutral explanations provided by [the prosecutor] . . . all relied on the types of evidence that this Court has approved in support of establishing the racial neutrality of a peremptory challenge" where prosecutor "testified that in narcotics cases she avoided selecting jurors who had family members who had either been arrested or undergone negative experiences with the police"). Further, Collier was unemployed, which Courts in this Circuit have also accepted as a satisfactory race-neutral reason. See United States v. Alvarado, 951 F.2d 22, at 24-25 (2d Cir. 1991) (allowing challenges based on age, life experience and employment); Jordan v. Lefevre, 22 F. Supp. 2d 259, 272-73 (S.D.N.Y. 1998) (citing cases utilizing age, life experience, employment, and criminal history as acceptable factors).

Similarly, the reasons for striking Moody and Bundy were plausible and supported by the record. Specifically, Moody's and Bundy's respective statements in response to the prosecutor's questioning reflected that they may not understand and/or be able to properly apply the reasonable doubt standard, which is a key concept in finding a defendant guilty. See Majid v. Portuondo, 428 F.3d 112, 131 (2d Cir. 2005) (race-neutral reasons were plausible where they "could have raised . . . concerns about the degree of sympathy that the prospective jurors might feel for the defendants, the skepticism with which they might view the prosecution's case, and any other hesitation they might harbor about rendering a verdict adverse to the defendants").

In sum, the ultimate determination of discriminatory intent "depends on an aggregate assessment of all the circumstances," Alvarado, 951 F.2d at 26, and, taking the record as a whole, this Court simply cannot conclude that Petitioner has rebutted, by clear and convincing evidence, the presumptive correctness of the trial court's factual finding that the prosecutor had not engaged in purposeful discrimination. See 28 U.S.C. § 2254(e)(1). Notably, Petitioner's attempts at rebuttal in his Reply papers are unavailing in that they are primarily focused on his own observations of the three jurors and his personal, unsubstantiated assessment of their responses and their ability to remain fair and impartial. See Reply at 30-37.

Accordingly, Petitioner cannot prevail on his claim that the prosecutor's stated reasons for his challenges to jurors Collier, Moody, and Bundy were pretextual.  His <u>Batson</u> claim is therefore denied in its entirety.

## VI.  Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed.  In light of the Court's disposition of Afrika's petition for a writ of habeas corpus, his requests for appointment of counsel, an evidentiary hearing, and production of documents, as he sets forth in his "Consolidated Reply" (Dkt. No. 18), are denied as moot.

Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. <u>See, e.g.,</u> <u>Lucidore v. New York State Div. of Parole</u>, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  <u>Coppedge v. United States</u>, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with

United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**


S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:      November 4, 2013
            Rochester, New York